# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Kevin Van Der Bosch,

        Plaintiff,

     v.

Michael J. Astrue, Commissioner
of Social Security,

        Defendant.

Civil No. 09-1247 (DWF/SRN)

## **REPORT AND RECOMMENDATION**

---

Frank Levin and James Roth, Esqs., Frank W. Levin, P.A., 331 2nd Avenue South, Suite 420, Minneapolis, Minnesota 55401.

Lonnie Bryan, Esq., United States Attorney's Office, 300 South Fourth Street, Suite 600, Minneapolis, Minnesota 55415, for Defendant.

---

SUSAN RICHARD NELSON, United States Magistrate Judge

Pursuant to 42 U.S.C. § 405(g), Plaintiff Kevin Van Der Bosch seeks judicial review of the final decision of the Commissioner of Social Security ("Commissioner"), who denied Plaintiff's application for disability insurance benefits. Both parties have filed motions for summary judgment, [Docket Nos. 6 and 9], and the motions have been referred to the undersigned United States Magistrate Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1) and District of Minnesota Local Rule 72.1. For the reasons set forth below, the Court recommends that Plaintiff's motion be denied and Defendant's motion be granted.

# I.    <u>BACKGROUND</u>

## A.    **PROCEDURAL HISTORY**

Plaintiff Kevin Van Der Bosch applied for disability insurance benefits (DIB) and supplemental security income (SSI) on September 9, 2005. (Admin. R. at 79). He alleged a disability onset date of June 16, 2005, due to degenerative disc disease, depression, suicidal ideations, anxiety, and panic attacks. (<u>Id.</u> at 84-91). The applications were denied initially and upon reconsideration. (<u>Id.</u> at 33-36). Plaintiff requested a hearing before an Administrative Law Judge (ALJ), which was held before ALJ Leonard A. Nelson on August 30, 2007. (<u>Id.</u> at 53, 401-38). On December 28, 2007, ALJ Nelson issued an unfavorable decision. (<u>Id.</u> at 20-31).

The Plaintiff filed a request for review of the ALJ's decision and the Appeals Council granted the request on January 20, 2009, finding the ALJ made an error of law. (<u>Id.</u> at 387-89). Specifically, the Appeals Council concluded the ALJ erred by relying on Rule 201.21 of the Medical-Vocational Guidelines, which applies to individuals under the age of 50, when in fact, Plaintiff was 50 years of age at the time of the ALJ's decision. (<u>Id.</u>). The Appeals Council then issued an unfavorable decision on March 26, 2009. (<u>Id.</u> at 5-9). The Appeals Council adopted the ALJ's decision with the additional finding that Plaintiff was not disabled under Rule 202.14 of the Medical-Vocational Guidelines, which is the rule that applies to persons between the ages of 50-54 with a high school education, skilled or semi-skilled work experience, and no transferable skills. (<u>Id.</u>). The Appeals Council's decision is the final decision of the Commissioner. <u>See</u> 42 U.S.C. § 405(g).

## B.    PLAINTIFF'S TESTIMONY

Plaintiff testified at the hearing before the ALJ that he was seeking social security benefits because of major depressive disorder, anxiety, panic attacks, and degenerative disc disease.  (Id. at 406, 407).  To treat his mental conditions, Plaintiff was taking Zoloft, Remeron, and Seroquel.  For hypothyroidism, Plaintiff took Levothyroxine.  (Id. at 407).  Plaintiff reported difficulties sleeping, even with his prescription medications.  (Id. at 407).  Plaintiff testified that the disc disease caused him pain in his back that radiated down to both his legs.  (Id. at 407).  For the back pain, Plaintiff took Aleve and visited a chiropractor.  (Id. at 408).  Further, Plaintiff testified he had pain in both hips and his left knee.  (Id.).  He reported that he had a left hip replacement approximately a year and a half before the ALJ hearing, and that he was scheduled for a total knee replacement surgery in October 2007.  (Id.).  Plaintiff also reported numbness in his hands that caused him to drop things a couple of times a month.  (Id. at 411).  Plaintiff testified that his mental health was better since his application for benefits, but physically he was doing worse with respect to the pain in his back and knee.  (Id. at 412).

Plaintiff graduated from high school and had past work experience as a truck driver, although Plaintiff did not have a driver's license because it had been suspended in June of 2005.  (Id. at 406).  Plaintiff had last worked in June 2005 as a driver for a recycling company.  (Id. at 411-12).  The job involved both driving and warehouse work.  (Id. at 412).  Plaintiff testified he quit the position due to his anxiety and panic attacks.  (Id.).

 With respect to daily activities, Plaintiff was able to sweep the floors in his apartment.  (Id. at 407).  He tried to go to church on a daily basis.  (Id. at 408).  Plaintiff reported that he watched television at home, read, and sometimes played cards with friends.  (Id. at 409-10).  He did not go to visit friends away from home, however, and did not go to the movies.  (Id.).

Plaintiff did water exercises three times per week, and did stretching exercises and yoga once a week with his Adult Rehabilitative Mental Health Services (ARMHS) worker. (Id. at 410, 419). The ARMHS worker also took Plaintiff on an outing at least every other week. (Id. at 419). Plaintiff stated that he did not cook very often and instead used a lunch program available through his building. (Id. at 410-11). Plaintiff estimated that he could walk for 15 to 20 minutes and stand for the same amount of time. (Id. at 412-13). He reported that he could bend at the waist but, because of his knees problems, he could not stoop or squat. (Id. at 413). When Plaintiff was not experiencing numbness in his hands, he could use buttons, snaps, and zippers normally. (Id. at 413). He estimated he could lift between ten and twenty pounds. (Id.). Plaintiff testified that he could sit for approximately one half hour. (Id. at 413).

With respect to his depression, Plaintiff testified that he did not have any thoughts of hurting himself or other people. (Id. at 413). He did, however, report feelings of loneliness, hopelessness, and feeling like a failure, along with a loss of appetite, jitteriness, and fidgeting. (Id. at 417). Plaintiff also reported memory problems. (Id. at 413-14). He also had lost interest in activities, such as, fishing, exercising, riding a bike, walking, reading, and watching movies. (Id. at 417). When Plaintiff did read or watch TV, he reported having problems concentrating. (Id. at 418). In response to questions from his attorney, he described his panic attacks. (Id. at 416). Plaintiff stated that he would feel paranoid, start sweating, his heart beat would increase, and his muscles would tense. (Id. at 416). Plaintiff testified he had panic attacks approximately four to six times per year, with each attack lasting between ten and twenty minutes. (Id. at 416).

At the time of the hearing, Plaintiff testified that he had been sober for almost six months. (Id. at 409). Plaintiff had been attending Alcoholics Anonymous (AA) meetings for five or six years and, at that time, was going to meetings three or four times per week. (Id. at 408). In

2001, Plaintiff started working on becoming sober. (Id. at 420). Since that time, Plaintiff had five or six relapses and his longest period of sobriety was two years. (Id.). During the periods that Plaintiff was sober, he testified he still experienced anxiety and depression and was unable to work. (Id. at 421).

In response to questions from his attorney, Plaintiff opined that he could work a "real simple low stress job" for a half day but not a full day. (Id. at 422). Plaintiff testified he would not be able to work eight hours a day, five days a week at any of his previous jobs. (Id. at 422).

### C.    MEDICAL EVIDENCE IN THE RECORD

On June 1, 2005, some friends took Plaintiff to Regions Hospital for a crisis evaluation. (Id. at 152-55). Plaintiff reported to Nurse Tobi Sanetra that he was "mentally ill" and had severe depression. (Id. at 152). While he denied suicidal thoughts, he did tell staff he "didn't want to wake up in the morning." (Id.). Plaintiff also stated he had drunk a quart of vodka that day and had been drinking for days. (Id.). At that time, Plaintiff had previously been through chemical dependency treatment four times. (Id.). Dr. Bradley Hernandez diagnosed Plaintiff with acute alcohol intoxication and depressive disorder. (Id. at 153). Dr. Hernandez referred Plaintiff to the Ramsey County Detoxification Center and recommended a follow-up evaluation for depression. (Id. at 153).

After a referral from the detox facility, Plaintiff was seen by social worker Sherlee Ness, from the Ramsey County Crisis Program. (Id. at 264). Ms. Ness noted that Plaintiff had been admitted for detox on five prior occasions and had a history of depression. (Id.). Because of Plaintiff's depression and chemical dependency issues, Ms. Ness recommended Plaintiff enter treatment at Hewitt Crisis Residence ("Hewitt Crisis") after he was discharged from detox. (Id.).

A social worker and clinical specialist at Hewitt Crisis completed a Vulnerable Adult Risk Assessment on Plaintiff on June 4, 2005. (Id. at 262-63). The evaluator noted Plaintiff showed vulnerabilities in self care and personal hygiene, had medical problems (thyroid problems and arthritis), suffered from chemical dependency, and had suicidal thoughts. (Id. at 262). Before his detox, Plaintiff had been kicked out of a sober house the previous week for drinking and was currently homeless. (Id. at 247, 258). Hewitt Crisis created a treatment plan for Plaintiff on June 5, 2005. (Id. at 248). Plaintiff was to meet with a psychiatrist to discuss medications and attend group sessions multiple times per day. (Id.). Additionally, Plaintiff was to meet with staff for stress management, coping skills, medication education, and supportive counseling. (Id.). After treatment at Hewitt Crisis, staff wanted Plaintiff to enter a sober house. (Id.).

On June 5, 2005, Plaintiff was evaluated by a doctor at Hewitt Crisis. (Id. at 254-59). The doctor noted Plaintiff was suicidal but without a current suicide plan and, therefore, considered Plaintiff a low risk for suicide. (Id. at 254). Plaintiff also had thoughts of self-injurious behaviors. (Id.). The doctor also noted Plaintiff's history of depression and alcohol dependence. (Id. at 254). Plaintiff was diagnosed with alcohol dependence, anxiety, depression, hypothyroidism, arthritis, and a history of gout. (Id. at 255, 259). The doctor assigned Plaintiff a GAF of 35.[1] (Id.) Although Plaintiff had not been on medication for five years, the doctor planned to restart Plaintiff on Zoloft for the depression and to house Plaintiff at Hewitt Crisis for one to three days. (Id. at 246, 255, 259). On June 6, 2005, Plaintiff completed a Crisis Action

---

[1] A Global Assessment of Functioning (GAF) score is a doctor's judgment of the individual's overall level of functioning, not including impairments due to physical or environmental limitations. American Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders Text Revision, 32-34 (4th ed. 2000). A GAF below 50 is indicative of a severe impairment and "serious limitations in the patient's general ability to perform basic tasks of daily life." Brueggemann v. Barnhart, 348 F.3d 689, 695 (8th Cir. 2003).

Plan to give him insight into his condition and the events that lead to his treatment at Hewitt Crisis. (Id. at 249-51). Plaintiff was discharged from Hewitt Crisis on June 9, 2005. (Id. at 245).

Plaintiff returned to the Ramsey County Detoxification Center on June 19, 2005. (Id. at 244). He had received a DUI on June 16, 2005. (Id.). At that time, Plaintiff was not taking his Zoloft because he was unable to get his medication, which was in his car when his car was impounded. (Id. at 239, 244). Pa Der Vang, a licensed social worker for the Ramsey County Crisis Program, noted Plaintiff had a 25 year history of alcohol dependency. (Id. at 244). During the intake, Plaintiff stated that if he left detox he would kill himself. (Id.). Plaintiff asked to be institutionalized for mental health treatment citing fears he would drink himself to death or walk in front of a car while drunk. (Id.).

Hewitt Crisis did another risk assessment for Plaintiff on his admission to the facility on June 20, 2005, noting Plaintiff's vulnerabilities regarding chemical abuse and suicidal thoughts. (Id. at 242-43). Plaintiff was again seen by a psychiatrist at Hewitt Crisis on June 21, 2010. (Id. at 240-41). He was diagnosed with depression, anxiety disorder, and alcohol dependence and assigned a GAF of 38. (Id. at 241). The crisis center planned to resume Plaintiff's Zoloft and to assist him in resolving his housing situation. (Id. at 240-41). Hewitt Crisis noted Plaintiff's stressors and problems, including his recent DUI, his sister's cancer diagnosis, the loss of his job, his arthritis, and hypothyroidism. (Id. at 236-37, 240). Plaintiff had lost his job the week before and had again been kicked out of his sober house. (Id.). He reported problems sleeping, decreased appetite, severe feelings of hopelessness and helplessness, depression, suicidal thoughts, anxiety, delusions, problems concentrating, and paranoia. (Id. at 234). At that time, Plaintiff's prescriptions included Campral for alcohol cravings, Levothyroxine for

hypothyroidism, and Zoloft for depression. (<u>Id.</u> at 179). Hewitt Crisis staff created a treatment plan of group meetings, counseling with psychiatrists, sessions with staff counselors, and possibly a partial hospitalization program after his discharge from the crisis center. (<u>Id.</u> at 230).

While at Hewitt Crisis, on June 24, 2005, Plaintiff filled out an intake form to begin treatment for depression and anxiety at Pathways Counseling Center ("Pathways"). (<u>Id.</u> at 179-84). He told the evaluator that he often did not want to get out of bed. (<u>Id.</u> at 181). Plaintiff reported that his symptoms included a depressed mood, manic symptoms, sleep disturbances, low energy, loss of interest in activities, feelings of hopelessness and worthlessness, anxiety, panic attacks, and alcoholism. (<u>Id.</u> at 182). He also noted he had participated in multiple previous inpatient treatments for chemical dependency. (<u>Id.</u> at 183). The evaluator considered Plaintiff's insight into the interrelation between his mental impairments and his alcoholism as a positive motivation for Plaintiff to participate in treatment. (<u>Id.</u> at 183). On June 27, 2005, Plaintiff was discharged from the Hewitt Crisis Residence to Green House Recovery Center, a sober house in St. Paul. (<u>Id.</u> at 227). Plaintiff was also scheduled to begin counseling sessions at Pathways. (<u>Id.</u>).

After an intake session on June 29, 2005, Pathways' social worker and therapist John Mosedale created a treatment plan for Plaintiff. (<u>Id.</u> at 177-78, 181-84). Mr. Mosedale developed a number of strategies to help Plaintiff maintain his sobriety, such as avoiding environments with alcohol, exploring sober activities, attending Alcoholics Anonymous (A.A.) meetings, and finding a sponsor. (<u>Id.</u> at 178). For Plaintiff's depression and anxiety, Mr. Mosedale set an objective of decreasing the severity and frequency of Plaintiff's symptoms through activities including attending a day treatment program at Pathways, and regular meetings with a counselor, learning coping skills, and taking prescribed medications. (<u>Id.</u> at 177).

Plaintiff began the day treatment program at Pathways on July 5, 2005, during which time he continued to live at Green House. (Id. at 169). That day, Plaintiff reported to Mr. Mosedale an improved mood and stated his cravings for alcohol had decreased since starting Campral. (Id. at 170). He further reported that he was not experiencing any side effects from his anti-depressant medication. (Id.). For Plaintiff's mental health issues, Mr. Mosedale began working on cognitive behavioral therapy (CBT) techniques with Plaintiff. (Id.). Plaintiff continued to have regular one-on-one counseling sessions with Mr. Mosedale throughout July, August and September 2005. (Id. at 170-175).

On referral from Pathways, Plaintiff began psychotherapy sessions with a licensed social worker, Michael Graff, at St. Anthony Mental Health Clinic on July 6, 2005. (Id. at 334). Mr. Graff concluded that Plaintiff "easily meets criteria for MDD [major depressive disorder]." and rated Plaintiff's best GAF in the past year as 58, with his lowest as 48. (Id. at 334, 331). Mr. Graff recommended one-on-one psychotherapy sessions using CBT techniques and solution-oriented therapy. (Id.). Dr. Roger Johnson, also of St. Anthony Mental Health Clinic, prescribed Zoloft. (Id. at 330). Plaintiff continued to see Mr. Graff and Dr. Johnson regularly throughout July, August, and September of 2005. (Id. at 324-30).

Plaintiff saw Dr. Nemera Weyessa at Summit Orthopedics on July 7, 2005, for evaluation of his right hip pain. (Id. at 299). Because of his pain, Plaintiff was limping when walking. (Id.). Dr. Weyessa ordered x-rays of Plaintiff's hip and prescribed 800 m.g. of Ibuprofen every eight hours as needed. (Id.). Testing from St. Paul Radiology showed Plaintiff had severe degenerative arthritis in his right hip, with marked narrowing of the joint space and cystic changes in the acetabulum and femoral head. (Id. at 164). In the left hip, Plaintiff had mild joint

space narrowing (Id.).  Finally, testing revealed degenerative disc disease and degenerative facet disease in the lower lumbar spine.  (Id.).

Plaintiff saw Mr. Mosedale again on July 12, 2005.  (Id. at 171).  He reported increased depression on weekends, but noted his group therapy sessions were helpful.  (Id.).  At the next session, on July 19, 2010, Plaintiff reported waking up several times each night.  (Id. at 171-72).  Plaintiff denied suicidal ideation and stated he did not have "serious" depressive symptoms.  (Id. at 172).  Mr. Mosedale recommended that Plaintiff try meditation for his symptoms.  (Id.).  That same day, Plaintiff also met with Mr. Graff and discussed the possibility of applying for disability benefits because of his hip arthritis.  (Id. at 329).

Plaintiff returned to Dr. Weyessa on July 18, 2005 for a follow-up on his hip pain.  (Id. at 159).  At that visit, the doctor noted that prolonged sitting caused Plaintiff diffuse pain and made it difficult for him to walk or get up.  (Id. at 159).  On examination, Dr. Weyessa observed Plaintiff had only 20 degrees of external rotation, zero degrees of internal rotation and 25 degrees of abduction.  (Id. at 159).  Plaintiff's leg was one half inch shorter on the right than on the left.  (Id. at 160).  Doctor Weyessa diagnosed end-stage degenerative arthritis and concluded that Plaintiff would "most likely" need a total hip replacement, but planned to first do a steroid injection at the hip.  (Id. at 160).  Thereafter, Plaintiff had a right hip injection of Depo-Medrol and Marcaine on July 20, 2005 at United Hospital.  (Id. at 162).

Plaintiff saw Dr. Johnson on July 22, 2005, and indicated that his mood had improved with an increased dose of Zoloft.  (Id. at 327).  At that visit, Dr. Johnson also added Cymbalta and Campral to Plaintiff's medications.  (Id.).

At Plaintiff's July 28, 2005 meeting with Mr. Graff, Plaintiff reported no cravings for alcohol, but felt depressed at "how he has squandered his life so much."  (Id. at 327).

At Plaintiff's next session with Mr. Mosedale, on August 9, 2005, he reported that his hip pain affected his mood and interfered with his concentration. (Id. at 172). Plaintiff denied any desire to use alcohol. (Id.)

Because Plaintiff was having difficulties with insomnia, Dr. Johnson added Seroquel to Plaintiff's medications on August 11, 2005. (Id. at 326). Plaintiff felt the Campral was helping his cravings for alcohol. (Id.).

Plaintiff visited Summit Orthopedics on August 15, 2005, for a follow-up on his right hip pain. (Id. at 157-61). Plaintiff rated his pain as nine out of ten in terms of severity and stated his pain was the same as it had been at his last visit. (Id. at 161). He described the pain as constant, sharp, stabbing, and aching. (Id.). Plaintiff also reported that his recent hip injection had not alleviated his pain. (Id.). Because he did not have relief from the steroid injection, Dr. Paul Yellin discussed hip replacement surgery with Plaintiff. (Id. at 157-58). Plaintiff was then scheduled for surgery in October 2005. (Id.).

On August 16, 2005, Plaintiff reported to Mr. Mosedale that he felt "stuck" and like he "had hit a wall." (Id. at 173). Plaintiff reported feeling fearful, worried, and alone. (Id.). Mr. Mosedale made plans for Plaintiff to meet with a psychiatrist for medication. (Id.).

Mr. Graff completed a Diagnostic Assessment for Ramsey County Mental Health Case Management on August 18, 2005. (Id. at 320-23). Mr. Graff diagnosed major depressive disorder, avoidant personality disorder, and alcoholism, and assigned Plaintiff a GAF of 46. (Id. at 320). Mr. Graff recommended psychological and neurological testing and stated Plaintiff needed mental health services including Adult Rehabilitative Mental Health Services (ARMHS), psychiatric treatment, and psychotherapy. (Id. at 320, 323). Mr. Graff also completed a Rule 79 Case Management and ARMHS Statement of Need and concluded that Plaintiff was seriously

and persistently mentally ill and was in need of case management services because of Plaintiff's long history of chemical dependency and episodes of major depression. (Id. at 318-19).

On August 23, 2005, Plaintiff and Mr. Mosedale met and discussed plans for Plaintiff's housing after his upcoming hip surgery. (Id. at 173). Plaintiff also practiced mindfulness based stress reduction techniques with the therapist, which he reported provided him with relief from his hip pain. (Id.).

Plaintiff visited Dr. Weyessa on August 26, 2005, to follow-up on his hypothyroidism. (Id.). At that time, he was taking 100 mg of Synthroid per day. (Id.).

At his August 30, 2005 session, Plaintiff asked Mr. Mosedale to assist him with his application for disability benefits. (Id.). At that time, Plaintiff continued to practice mindfulness based stress reduction practices (meditation) and CBT techniques. (Id.).

A Mental Illness/Chemical Dependency functional assessment for Ramsey County was completed on August 30, 2005. (Id. at 357-58). The assessors concluded that Plaintiff had slight problems with mental health symptoms and moderate problems with his need for mental health services, vocational functioning, social functioning, self-care and independent living, and obtaining and maintaining financial assistance. (Id. 357-58). The case management study indicated Plaintiff should receive psychiatric services, day treatment services, ARMHS services, and case management. (Id. at 361, 368).

On September 8, 2005, Dr. Johnson noted that Plaintiff's mood had been mostly euthymic (non-depressed) and Plaintiff had stayed sober. (Id. at 316). Nevertheless, Plaintiff still had some mild depression and continued to experience insomnia. (Id.). Dr. Johnson continued Plaintiff's prescriptions for Zoloft, Campral, and Seroquel. (Id.).

On September 7, 2005, Mr. Mosedale and Plaintiff worked on a relapse prevention plan. (Id. at 174). Plaintiff reported feelings of inadequacy. (Id.). At the next session, on September 14, 2005, Mr. Mosedale reported that Plaintiff's treatment would be "put on hold" so that Plaintiff could have hip surgery. (Id.). Mr. Mosedale was in contact with Plaintiff's surgeon and worked with other agencies to determine Plaintiff's housing options after the surgery. (Id.).

Dr. Graff noted on September 15, 2005, that Plaintiff's depression was "somewhat worse . . . [Plaintiff] is not depressed but is really aware of how sabotaged his life is as a result of his drinking." (Id. at 313).

At Plaintiff's next therapy session with Mr. Mosedale, on September 21, 2005, Plaintiff reported feeling nervous about his upcoming surgery. (Id. at 175). Mr. Mosedale spoke to Plaintiff's surgeon and was assured the surgeon would order that Plaintiff be placed in a nursing home after the surgery. (Id.).

Plaintiff returned to Mr. Graff on September 29, 2005 and reported he was doing "o.k." and that his medications, especially the Campral, were generally helping. (Id. at 313). Plaintiff was not experiencing side effects from the medications. (Id.).

On September 26, 2005, Mr. Mosedale completed a function report on Plaintiff for his disability benefits application. (Id. at 111-18). Mr. Mosedale first noted he spent approximately two hours per week with Plaintiff on education and counseling. (Id.). Mr. Mosedale reported that Plaintiff's daily activities included bathing, eating, attending AA meetings, attending therapy and groups at Pathways, and going to church. (Id.). Mr. Mosedale reported that Plaintiff's mood was severely impacted by his physical pain and that his hip pain and depression interfered with Plaintiff's ability to walk, exercise, interact socially, work, and attend support groups. (Id. at 112). Mr. Mosedale stated that Plaintiff's hip surgery would require Plaintiff to relearn how to

dress, bathe, and care for himself and that his depression interfered with Plaintiff's self-care. (Id.). Because of Plaintiff's depression, Mr. Mosedale stated that Plaintiff needed reminders to take his medications consistently and his desire to eat and prepare food was reduced. (Id. at 113). Mr. Mosedale also stated that Plaintiff's upcoming hip surgery would prevent him from lifting, squatting, twisting, bending, standing, reaching, walking, sitting, kneeling, and climbing stairs. (Id. at 113, 116). Mr. Mosedale also reported that Plaintiff's depression impaired his memory and his ability to concentrate, focus, and retain information. (Id. at 115). Mr. Mosedale estimated that Plaintiff could walk approximately one block and could pay attention for twenty minutes. (Id. at 116). Because of the depression, anxiety, and chronic pain, Mr. Mosedale stated Plaintiff had a low stress threshold. (Id. at 117). In conclusion, Mr. Mosedale opined that Plaintiff was disabled from major depression, physical disabilities, and chronic alcoholism. (Id. at 118).

Plaintiff met with Mr. Mosedale again on September 27, 2005. (Id. at 175). Plaintiff reported ongoing memory problems due to his pain and depression. (Id.). Plaintiff stated he felt increasing support from the peers in his group sessions. (Id.). Plaintiff's treatment at Pathways was put on hold on October 3, 2005, because of his upcoming hip surgery. (Id. at 176). Plaintiff was still living in a halfway house at this time. (Id. at 198).

Plaintiff underwent a total right hip replacement, with no complications, at United Hospital on October 7, 2005. (Id. at 185-86). Plaintiff was given Vicodin and aspirin post-surgery. (Id. at 185-86, 198). On October 11, 2005, hospital staff began making plans to discharge Plaintiff to a shelter, until he could find a more permanent living arrangement, with instructions on after-care, occupational therapy, and home exercises. (Id. at 189). Because Plaintiff was on medical assistance (M.A.), and M.A. would not approve of rehabilitation stays

for persons requiring less than minimal assistance, the hospital decided not to discharge Plaintiff until he could use stairs and carry objects, such as a food tray, while using a walker. (Id. at 199).

After discharge from the hospital on October 14, 2005, Plaintiff planned to stay at the Union Gospel Mission. (Id. at 226). A social worker from United Hospital called the Ramsey County Crisis Program that same day seeking another referral to Hewitt Crisis Residence. (Id. at 226). Plaintiff was feeling anxious and fearful about going to the shelter following his surgery. (Id.). Plaintiff was then admitted to Hewitt Crisis with vulnerabilities in the areas of lack of transportation, significant medical problems, and freedom from chemical abuse. (Id. at 224-25). At that time, Plaintiff had not used alcohol since his DUI on June 16, 2005. (Id. at 218). Once again, Plaintiff reported problems sleeping, feeling hopeless and helpless, depression, anxiety, and memory problems. (Id. at 216). Plaintiff denied, however, suicidal thoughts or self-injurious behaviors. (Id.). The crisis center psychiatrist reaffirmed Plaintiff's diagnoses of depression, anxiety, alcohol dependence, and assigned Plaintiff a GAF of 35. (Id. at 219, 222-23). At that time, Plaintiff was taking Campral, Levothyroxine, Seroquel, and Zoloft. (Id. at 212). Hewitt Crisis staff created a treatment plan for Plaintiff including attending at least one group meeting a day, individual meetings with staff, working with counselors to find housing, continued counseling at Pathways, and A.A. (Id. at 212). Hewitt Crisis discharged Plaintiff on October 18, 2005 to Mary Hall, a homeless shelter. (Id. at 210).

Dr. Alford Karayusuf, a state agency consultant, examined Plaintiff on October 27, 2005. (Id. at 265-68). Dr. Karayusuf reviewed Plaintiff's medical records and noted Plaintiff's history of depression, including a psychiatric hospitalization at Regions Hospital in 2000. (Id. at 265-66). At that time, Plaintiff was taking Zoloft, Seroquel, Compril, and Synthroid. (Id. at 266). He reported that he continued to experience depression, had frequent suicidal thoughts, had

extreme anxiety and panic attacks, had racing thoughts and felt "useless and worthless." (Id.). Plaintiff reported to the doctor that he bathed every day, made his bed once or twice a week, rode the bus to get around, and did his own laundry, but he did not dust, vacuum, or wash dishes. (Id.). He went to church and AA meetings and watched television three to four hours per day. (Id.). He no longer participated in hobbies he enjoyed, such as camping and riding bicycles, because of his anxiety. (Id. at 266-67). The mental status examination revealed low average intelligence and intact memory. (Id. at 267). Dr. Karayusuf diagnosed major depression, recurrent, moderate in partial remission, anxiety disorder with features of panic attacks, polysubstance abuse disorder, in remission, and dependent personality disorder. (Id.). Based on these diagnoses, Dr. Karayusuf concluded Plaintiff could understand, retain, and follow simple instructions, and manage his benefits. (Id. at 268). However, he opined Plaintiff would not be able to interact with the public and would be restricted to brief superficial interactions with fellow workers and supervisors. (Id.). Finally, Dr. Karayusuf stated "[w]ithin these parameters he is able to maintain pace and persistence." (Id.).

Agency Consultant Dr. Daniel Larson completed a Mental Residual Functional Capacity Assessment, Physical Residual Functional Capacity Assessment, and Psychiatric Review Technique for Plaintiff on November 3, 2005. (Id. at 269-294). Dr. Larson concluded that Plaintiff had moderate limitations in his ability to understand and remember detailed instructions, to carry out detailed instructions, to maintain attention and concentration for extended periods, to work in coordination with or in proximity to others without being distracted by them, and to interact appropriately with the general public. (Id. at 269). Additionally, Dr. Larson noted Plaintiff was able to do some cooking, cleaning, laundry, and shopping. (Id. at 271). Dr. Larson stated that Plaintiff's concentration was somewhat impaired, but sufficient to do basic chores.

He concluded that Plaintiff could remember and carry out three and four step instructions, but would be markedly limited for detailed or complex tasks. (Id. at 271). Dr. Larson opined that Plaintiff's ability to cope with co-workers and handle public contacts would be reduced but adequate for brief and superficial contact. (Id.). He noted Plaintiff would have a reduced ability to handle stress. (Id.). Dr. Larson concluded Plaintiff had medically determinable impairments of depression, anxiety, and substance abuse. (Id. at 273-81). He rated Plaintiff as having mild limitations in the restrictions of activities of daily living, moderate limitations in maintaining social functioning, and concentration, persistence or pace, and no episodes of decompensation. (Id. at 283). Based on Plaintiff's degenerative arthritis and joint replacement, Dr. Larson opined Plaintiff could occasionally lift and carry twenty pounds and frequently lift and carry ten pounds. (Id. at 288). He stated Plaintiff could stand or walk six hours in an eight hour work day, and he could sit six hours in an eight hour workday. (Id.) Dr. Larson opined that Plaintiff had no limitations in pushing or pulling. (Id.). With respect to postural limitations, Dr. Larson opined that Plaintiff could frequently climb ramps and stairs, balance, stoop, kneel, and crouch and occasionally climb ladders or crawl. (Id. at 289). Finally, Dr. Larson concluded Plaintiff had no manipulative limitations, visual limitations, communicative limitations, or environmental limitations. (Id. at 290-91).

After his surgery, Plaintiff next met with Mr. Graff on November 4, 2005. (Id. at 312). Mr. Graff noted that, two weeks earlier, Plaintiff had relapsed and used alcohol, one liter of vodka, because he "wasn't thinking" and was stressed. (Id.). That same day, Plaintiff visited Dr. Weyessa, requesting a referral for a neuropsychological evaluation because Plaintiff had been experiencing memory loss for the past six months. (Id. at 295). The doctor ordered blood tests, a liver function test, and a head CT. (Id.). The CT scan showed no evidence of intracranial

hemorrhage or intracranial mass-effect, but the scan did show mild generalized cerebral atrophy. (Id. at 301).

On November 16, 2005, Plaintiff was again maintaining his sobriety. (Id. at 315). Mr. Graff and Plaintiff discussed how Plaintiff's relapses quickly made him poorly motivated and "shut down." (Id. at 311). Although Plaintiff was not feeling tempted to drink, on November 25, 2005, Dr. Johnson prescribed Antabuse, which would make Plaintiff very sick if he drank. (Id. at 310-11). On November 29, 2005, Plaintiff reported to Mr. Graff that he generally felt optimistic and had not relapsed. (Id. at 310).

Mr. Mosedale wrote a letter on Plaintiff's behalf on November 30, 2005. (Id. at 386). He noted that Plaintiff was proactive and diligent in attending groups and his individual sessions. (Id.). Mr. Mosedale went on to state, "[Plaintiff] exhibits strong motivation to reframe his suffering in a manner that is non-destructive, productive, and sustainable . . . Kevin is also a reliable self-reporter who comprehends the gravity of his situation, as well as the liberating aspects of well-being available to and within himself." (Id.).

On December 6 and 9, 2005, Plaintiff underwent a neuropsychological evaluation with psychiatrist Kristen Ryan based on a referral from Plaintiff's shelter after staff observed Plaintiff experiencing memory deficits. (Id. at 302-08). Plaintiff reported that he had been sober since October 2005. (Id. at 302). Dr. Ryan noted Plaintiff had six in-patient chemical dependency treatments since 1986 and an estimated ten detox admissions, with blood alcohol levels as high as 0.3. (Id.). Plaintiff reported that he had a history of suicidal ideations and had once attempted suicide by overdosing on alcohol combined with his psychotropic medication. (Id.). Plaintiff reported some sensory difficulties and fine manipulative movement problems due to his arthritis. (Id. at 303). He also reported a history of multiple head injuries. (Id.). On examination,

Plaintiff was able to recall basic biographical information and was able to relate recent news events and the name of the President. (Id.). He did not exhibit language deficits suggesting receptive or expressive difficulties. (Id.). Dr. Ryan noted that Plaintiff's mood was generally in the normal range, with sadness noted when expressing painful experiences from his past. (Id.). His body movements reflected some ambulatory stiffness and slowing. (Id.). Dr. Ryan concluded that Plaintiff did not express evidence of delusions or symptoms of a thought disorder. (Id.). The Wechsler Adult Intelligence Scale revealed a full scale IQ of 102, placing Plaintiff in the average range. (Id. at 305). Plaintiff had a wide discrepancy, however, between his verbal abilities and his visuospatial skills (the capacity to visually perceive the spatial relationship between objects), suggesting Plaintiff would have certain difficulties with new learning. (Id. at 305). The results of Plaintiff's neurocognitive tests showed Plaintiff would have moderate to severe deficits for visuoconstructional tasks, which required spatial organization of a complex figure, and for recalling information both immediately and after a delay. (Id.). Plaintiff's overall memory functioning in nearly every domain demonstrated a mild impairment, with a mild to moderate impairment in general memory. (Id.). Memory testing showed both encoding and retrieval deficits. (Id.). In the area of working memory, which reflects attention and concentration abilities, Plaintiff scored in the above-average range, although the doctor believed the results were representative of Plaintiff's pre-morbid functioning because they were consistent with Plaintiff's preserved verbal abilities. (Id. at 306). Ultimately, Dr. Ryan diagnosed a mild to moderate deficit in memory, a moderate to severe impairment for visuospatial processing, and a mild to moderate limitation in adaptive functioning, depending on the task. (Id.). Dr. Ryan concluded that the testing showed bilateral involvement of the mesial temporal lobes, likely attributable to chronic alcohol use exacerbated by several head injuries. (Id.). Because Plaintiff

had not undergone neuropsychological testing previously, it was difficult for Dr. Ryan to assess the amount of decline in Plaintiff's cognitive functioning, but based on his education, employment history and intact scores, the overall findings "strongly suggest[ed] a marked decline." (Id. at 306-07). Dr. Ryan opined that Plaintiff's cognitive impairments would cause him difficulties in navigating new environments, and his general memory impairments would require use of compensatory strategies. (Id. at 307). Dr. Ryan suggested that Plaintiff would benefit from a residential environment, with staff to help prompt his memory, follow-through on important multi-step processes, and to monitor his alcohol use. (Id. at 307-08).

On February 20, 2006, agency consultant Dr. Janis Konhe completed a Mental Residual Functional Capacity Assessment and Psychiatric Review Technique. (Id. at 336-353). Dr. Konhe concluded Plaintiff had moderate limitations in the abilities to remember and carry out detailed instructions, to maintain attention and concentration for extended periods, to complete a normal work week without interruptions, to interact appropriately with the general public, to accept instructions and respond to criticism from supervisors, and to respond appropriately to changes in the work setting. (Id. at 336-37). Dr. Konhe did not find marked limitations in any area of functioning. (Id.) Dr. Konhe opined Plaintiff could concentrate, understand, and carry out routine repetitive instructions and that he could handle brief, infrequent, and superficial contacts with co-workers. (Id. at 338). She further opined that Plaintiff could handle ordinary levels of supervision in a customary work setting and he could handle the routine stresses of a routine work setting. (Id.). In the Psychiatric Review Technique, Dr. Konhe determined Plaintiff suffered from medically determinable impairments of organic mental disorder–memory impairment, secondary to alcohol dependence, affective disorder accompanied by depressive symptoms, anxiety disorder, and a personality disorder. (Id. at 340-49). Based on these

impairments, Dr. Konhe concluded Plaintiff would have moderate limitations in the activities of daily living, maintaining social functioning, and maintaining concentration, persistence, and pace. (Id. at 350). Ultimately, Dr. Konhe believed the medical records were consistent with mild depression and anxiety, mild to moderate memory deficits with continued ability to manage overlearned tasks. (Id. at 352). Dr. Konhe noted she did not include Plaintiff's pain or physical problems in her analysis. (Id.).

On February 22, 2006, Dr. Charles Grant affirmed the physical RFC assigned to Plaintiff by Dr. Larson. (Id. at 354-56).

On March 27, 2006, Lori Borschke, the program director for Pathways, wrote a letter on behalf of Plaintiff, asking that he be given ARMH services through Medical Assistance. (Id. at 385). Based on Plaintiff's treatment at Pathways and the neuropsychological testing, Ms. Borschke sought approval for treatment including ongoing mental health assessments, cognitive skills building, behavioral skills building, and mindfulness-based stress reduction. (Id.).

After Plaintiff experienced lower back pain after a sneeze, on August 8, 2007, Plaintiff had CT scans taken of his lumbar spine. (Id. at 377-81). The scans showed moderate degenerative central stenosis at L4-5 with osteophytes, disc bulging and moderate chronic right foraminal stenosis, moderate L2-3 and L3-4 central degenerative stenosis due to disc bulging, chronic advanced L5-S1 foraminal stenosis due to loss of disc height and lateral osteophytes with disc bulging and osteophytic spurring abutting the thecal sac without centeral stenosis, and gaseous degeneration at L4-5 and L5-S1 with no acute fractures identified. (Id. at 377-80).

Plaintiff was scheduled for a left total knee arthroplasty, due to degenerative joint disease, on October 5, 2007. (Id. at 384).

### D. EVIDENCE FROM THE MEDICAL EXPERT

A medical expert (ME), Dr. Michael Lace, testified at the administrative hearing. (Id. at 422-32). The ME testified that Plaintiff suffered from medically determinable impairments of major depressive disorder, neurological issues including alcohol induced persisting dementia, chronic alcoholism, and anxiety disorder. (Id. at 422-23). The ALJ then asked the ME about Plaintiff's limitations, without including Plaintiff's alcoholism. (Id. at 423). Based on Plaintiff's other impairments, the ME opined Plaintiff would have mild restrictions in daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, and pace, and no episodes of decompensation. (Id. at 424). If the ME included Plaintiff's alcoholism as an impairment, the ME testified Plaintiff would have moderate restrictions in daily living, marked difficulties in maintaining social functioning, marked difficulties in maintaining concentration, persistence, and pace, and no episodes of decompensation. (Id.). Based on his review of the medical records, the ME stated Plaintiff's alcoholism was material to a finding of disability. (Id. at 427). The ME testified that in most of the medical records, alcoholism was Plaintiff's primary or secondary diagnosis. (Id. at 427-28). The ME further testified there was no evidence in the record to indicate the Plaintiff would have been disabled by his other conditions during his periods of sobriety. (Id. at 431). The ME opined that Plaintiff would be limited to brief and superficial contact with supervisors, and be limited to routine, repetitive work. (Id. at 432).

### E. EVIDENCE FROM THE VOCATIONAL EXPERT

A vocational expert (VE), William Rutenbeck, also testified at the hearing. (Id. at 433-37). The ALJ asked Mr. Rutenbeck whether a person limited to light work could return to Plaintiff's past relevant work, and the VE testified no. (Id. at 433-34). The ALJ then asked the

VE to consider a hypothetical person of 51 years of age, with a high school education, past work experience as a piper and a driver and the impairments of anxiety, depression, and degenerative disc disease.  (Id. at 434).  The hypothetical individual would be physically limited to lifting and carrying not more than twenty pounds, could stand and walk six hours in an eight hour workday, and sit six hours in an eight hour day, but would have a sit/stand option at least each half hour.  (Id.).  The hypothetical individual would also be limited to brief and superficial contacts, unskilled work with minimum stress, and an environment with no alcohol or recreational drugs.  (Id.).  The VE testified that such an individual could not return to Plaintiff's past work but could perform work as an office helper, and some assembly and packaging positions that would allow for positional changes every half hour.  (Id.).  On questioning from Plaintiff's attorney, the VE testified that if the hypothetical included a marked limitation in the ability to complete a normal workday and work week, it would change the VE's opinion on what jobs the individual could perform.  (Id. at 436).  The VE stated that his opinion would also change if the hypothetical person was markedly limited in performing activities within a schedule and maintaining regular attendance.  (Id.).  The VE did not elaborate on how these opinions would change or if he was opining Plaintiff could not work with those additional restrictions.  (Id.).

## F.     THE ALJ'S DECISION

The Administrative Law Judge, Leonard Nelson, employed the required five-step sequential evaluation in his opinion:  (1) whether the claimant had engaged in substantial gainful activity;  (2) whether the claimant had a severe impairment;  (3) whether the claimant's impairment met or equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) whether the claimant was capable of returning to past work; and (5) whether the claimant could do other work existing in significant numbers in the regional or national economy.  20

C.F.R. § 404.1520(a)-(f).  The ALJ also followed the regulations for determining the effect of an individual's alcohol dependence on the disability determination.  20 C.F.R. § 404.1535(a).

At step one of the evaluation, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the onset date of June 16, 2005.  (Admin R. at 23).  At step two, the ALJ found that Plaintiff had severe impairments of:  alcohol dependence in early remission, hypothyroidism, severe degenerative arthritis of the right hip, status post total hip arthroplasty in 2005, recurrent major depression, anxiety disorder with panic, dependent personality disorder, degenerative disc disease of the lumbar spine, and degenerative joint disease of the left knee, status post left total knee arthroplasty in 2007.  (Id.).

At the third step, the ALJ concluded that Plaintiff's impairments, including the substance use disorders, met Listings 12.02 organic mental disorders, 12.04 affective disorders, 12.06 anxiety-related disorders, and 12.09 substance addition disorders in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Id. at 23).  The ALJ also concluded that Plaintiff was credible concerning his symptoms and limitations related to alcohol use.  (Id. at 24).  The ALJ then concluded that if Plaintiff stopped the substance abuse, the remaining limitations would cause more than a minimal impact on Plaintiff's ability to perform basic work activities, and therefore Plaintiff would continue to have a severe impairment or combination of impairments.  (Id.).  However, the ALJ next determined that even if Plaintiff stopped his substance abuse, his impairments or combination of impairments would not meet or equal a listed impairment.  (Id.).  Specifically, the ALJ noted that if Plaintiff stopped his alcohol use, he would only have mild restrictions in the activities of daily living, mild to moderate difficulties in social functioning, moderate difficulties in concentration, persistence, and pace, and mild to moderate memory deficits.  (Id.).

Turning to step four, the ALJ found that if Plaintiff stopped his substance abuse, Plaintiff would have the residual functional capacity to perform light work, lifting and carrying 20 pounds occasionally and ten pounds frequently, standing or walking six hours in an eight hour day, sitting for six hours in an eight hour day, and limited to no more than unskilled work.  (Id. at 25).  In formulating this RFC, the ALJ reviewed and analyzed the Polaski factors regarding Plaintiff's credibility, including Plaintiff's testimony about his pain and symptoms, Plaintiff's daily activities, the objective medical evidence, Plaintiff's treatment history, and Plaintiff's substance abuse.  (Id. at 26-29).  The ALJ concluded that if Plaintiff stopped his substance abuse, the Plaintiff's determinable impairments could reasonably be expected to produce the alleged symptoms, but Plaintiff's statements concerning the intensity, persistence, and limiting effects of the symptoms were not entirely credible.  (Id. at 26).  The ALJ described the objective medical evidence at length and explained his conclusions that the medical evidence did not support a limitation more restrictive than light work.  The ALJ also noted that Plaintiff was capable of independent personal care, could perform a wide range of household chores, used public transportation without difficulty, and attended church and AA meetings on a regular basis.  (Id. at 26-29).  The ALJ also noted that Plaintiff had renewed contacts with his son and remained sober for six months after completing a day treatment program.  (Id. at 29).

At the fifth step, the ALJ determined that, if the Plaintiff stopped his substance abuse, there were significant jobs in the national economy that a person with Plaintiff's age, education, work experience, and RFC could perform.  (Id. at 30).  Specifically, Plaintiff could perform work as an office helper and assembly positions.  (Id.).  Ultimately, the ALJ concluded that Plaintiff suffered from a disability, but that his substance abuse was a contributing factor material to the

determination of disability and therefore he was not entitled to benefits pursuant to 20 C.F.R. § 404.1535 and § 416.935.  (Id. at 21, 30).

## II.     STANDARD OF REVIEW

Congress has prescribed the standards by which Social Security disability benefits may be awarded.  "The Social Security program provides benefits to people who are aged, blind, or who suffer from a physical or mental disability."  Locher v. Sullivan, 968 F.2d 725, 727 (8th Cir. 1992).  "Disability" under the Social Security Act is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment."  42 U.S.C. § 423(d)(1)(A).  The claimant's impairments must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  Id. § 423(d)(2)(A).  The impairment must have lasted or be expected to last for a continuous period of at least twelve months, or be expected to result in death.  Id. § 423(d)(1)(A).

### A.     ADMINISTRATIVE REVIEW

If a claimant's initial application for benefits is denied, he or she may request reconsideration of the decision.  20 C.F.R. § 404.909(a)(1).  A claimant who is dissatisfied with the reconsidered decision may obtain administrative review by an ALJ.  Id. § 404.929.  If the claimant is dissatisfied with the ALJ's decision, he or she may request review by the Appeals Council, although review is not automatic.  Id. §§ 404.967-.982.  The decision of the Appeals Council, or of the ALJ if the request for review is denied, is final and binding upon the claimant unless the matter is appealed to a federal district court within sixty days after notice of the Appeals Council's action.  42 U.S.C. §§ 405(g), 1383(c)(3); 20 C.F.R. § 404.981.

## B. JUDICIAL REVIEW

Judicial review of the Commissioner's decision is limited to a determination of whether the decision is supported by substantial evidence in the record as a whole. Tellez v. Barnhart, 403 F.3d 953, 956 (8th Cir. 2005); Hutsell v. Sullivan, 892 F.2d 747, 748-49 (8th Cir. 1989). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971). The review is "more than a mere search of the record for evidence supporting the [Commissioner's] finding." Brand v. Sec'y of Dep't of Health, Educ. & Welfare, 623 F.2d 523, 527 (8th Cir. 1980). Rather, "the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." Id. (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951)); Kirby v. Sullivan, 923 F.2d 1323, 1326 (8th Cir. 1991).

The reviewing court must review the record and consider:

1. The credibility findings made by the ALJ;
2. The plaintiff's vocational factors;
3. The medical evidence from treating and consulting physicians;
4. The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments;
5. Any corroboration by third parties of the plaintiff's impairments; and
6. The testimony of vocational experts when required, which is based upon a proper hypothetical question which sets forth the claimant's impairments.

Johnson v. Chater, 108 F.3d 942, 944 (8th Cir. 1997) (citing Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989)). A court may not reverse the Commissioner's decision simply because substantial evidence would support an opposite conclusion. Tellez, 403 F.3d at 956; Baker v. Heckler, 730 F.2d 1147, 1150 (8th Cir. 1984). In reviewing the record for substantial evidence, the Court may not substitute its own judgment or findings of fact. Woolf v. Shalala, 3 F.3d

1210, 1213 (8th Cir. 1993). Instead, the court must consider "the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Gavin v. Heckler, 811 F.2d 1195, 1199 (8th Cir. 1987).

## III. DISCUSSION

In the instant case, Plaintiff contends that the ALJ erred by failing to acknowledge that the burden shifts to the Commissioner in determining if the claimant can perform a significant number of jobs in the national economy and in his determination that Plaintiff's substance abuse was material to the finding of disability. This Court concludes that the ALJ did in fact acknowledge the shifting burden of proof and did not err in analyzing the effects of Plaintiff's alcoholism. Because the ALJ's analysis and opinion are supported by substantial evidence, Plaintiff's motion should be denied and Defendant's motion granted.

### A. BURDEN OF PROOF

Citing to Roberts v. Apfel, 222 F.3d 466, 471 (8th Cir. 2000), Plaintiff argues that the ALJ erred by failing to acknowledge the shift in burden to the Commissioner in determining if the claimant can perform a significant number of jobs in the national economy. However, as Defendant correctly notes, the ALJ did in fact expressly acknowledge the burden shift. (Admin. R. at 22). Therefore Roberts is inapplicable to the instant case.

### B. SUBSTANCE ABUSE

Plaintiff contends that the ALJ erred by determining that his alcoholism was material to his disability. Under the 1996 amendments to the Social Security Act, if a claimant's alcohol abuse is a "contributing factor material to the Commissioner's determination" of a disability, the claimant is not entitled to benefits. 42 U.S.C. § 423(d)(2)(C); Vester v. Barnhart, 416 F.3d 886, 888 (8th Cir. 2005). The claimant has the burden of demonstrating that he would still be

disabled if he stopped using drugs or alcohol.  20 C.F.R. § 416.935(b)(1); <u>Pettit v. Apfel</u>, 218 F.3d 901, 903 (8th Cir. 2000).

In assessing disability for an individual with an impairment of substance abuse, the regulations require the ALJ to first determine whether the claimant is disabled, without "segregating out any effects that might be due to substance abuse disorders." <u>Brueggemann v. Barnhart</u>, 348 F.3d 689, 694 (8th Cir. 2003) (citing 20 C.F.R. § 404.1535(a)).  The Eighth Circuit has explained, "[t]he inquiry here concerns strictly symptoms, not causes, and the rules for how to weigh evidence of symptoms remain well established." <u>Id</u>.  If the claimant is disabled with the inclusion of the effects of substance abuse, the ALJ must next consider which limitations would remain when the effects of the substance use disorders are absent.  <u>Id.</u> at 694-95.  If the claimant is still actively abusing alcohol, "this determination will necessarily be hypothetical and therefore more difficult than the same task when the claimant has stopped." <u>Id.</u> (citing <u>Pettit v. Apfel</u>, 218 F.3d 901, 903 (8th Cir. 2000).  "If the ALJ is unable to determine whether substance use disorders are a contributing factor material to the claimant's otherwise-acknowledged disability, the claimant's burden has been met and an award of benefits must follow . . . In colloquial terms, on the issue of the materiality of alcoholism, a tie goes to [the claimant]" <u>Brueggemann</u>, 348 F.3d at 693.

Plaintiff contends that the ALJ was incorrect in finding that his alcoholism was material to his disability.  Plaintiff first points to portions of the record where Plaintiff expressed suicidal ideations.  (Pl.'s Memo. at 6).  At the time of these symptoms, however, Plaintiff was in detoxification or had only left the detox center days earlier.  (Admin. R. at 181, 240, 252, 264, 302).  In contrast, in July 2005, when Plaintiff had a few weeks of sobriety, Plaintiff denied suicidal ideation and told his counselor he did not have "serious" depressive symptoms.  (<u>Id.</u> at

172).  Likewise, in October 2005, when Plaintiff was sober for a number of months, he again denied having suicidal thoughts.  (Id. at 216).  While Plaintiff is correct that on one occasion during Plaintiff's sobriety, Mr. Graff noted Plaintiff's depression was "somewhat worse," Mr. Graff appeared to connect the increased depression to Plaintiff's upcoming hip surgery and later in the notes from that visit stated "[Plaintiff] is not depressed but is really aware of how sabotaged his life is as a result of his drinking."  (Id. at 313).  A month after his October relapse, Plaintiff's psychiatrist, Dr. Johnson, noted that Plaintiff's mood had been mostly non-depressed.  (Id. at 316).  Also in November 2005, agency consultant Dr. Larson rated Plaintiff as having only mild limitations in the restrictions of activities of daily living, moderate limitations in maintaining social functioning, and concentration, persistence or pace, and no episodes of decompensation.  (Id. at 283).  Likewise, in February 2006, when Plaintiff had a number of months of sobriety, agency consultant Dr. Konhe concluded Plaintiff did not have marked limitations in functioning from his mental impairments.  (Id. at 336-353).  These medical records support the ALJ's conclusion that Plaintiff's mental health impairments were less severe when the effects of Plaintiff's alcoholism were not considered.

Plaintiff also suggests that the ME testified that a person needed to be sober for a year before it could be determined whether the claimant's alcohol abuse was material to disability, a requirement not found in the regulations.  (Id. at 424).  After objections from Plaintiff's attorney, however, the ME later clarified that there was no set period of time that a person would need to be sober in order to determine if their alcoholism was material to disability.  (Id. at 426-27).  Nor did the ALJ ever opine in his analysis that a claimant needed to be sober for a year in order to determine if his alcoholism was material to disability.

Plaintiff's reliance on Brueggeman is likewise misplaced. Contrary to Plaintiff's assertions, the Court in Brueggeman did not hold that Plaintiff's "mental health problems were at least equal to his alcoholism." (Pl's Memo. at 8). Rather, the Court merely held that the ALJ in that case had failed to follow the analysis set out in the regulations by first determining whether the plaintiff was disabled including the effects of alcoholism. Brueggeman, 348 F.3d at 693. The Court then remanded the case for the ALJ to reconsider whether the plaintiff's alcoholism was material to disability. Id. at 695. While Brueggeman is instructive as to the correct procedure and analysis for cases involving alcoholism, because of the procedural posture of the case, it does not guide the Court in determining whether the Plaintiff's specific impairments rise to the level of disability, regardless of his alcohol use. Additionally, that case is readily distinguishable from the instant case. In Brueggeman, the plaintiff was hospitalized on multiple occasions for his mental health issues, even during periods of sobriety for as long as nine months. Id. at 694. In the instant case, the medical records support the conclusion that Plaintiff's depression and mental health symptoms improved during Plaintiff's periods of sobriety. Substantial evidence in the record as a whole supports the ALJ's conclusion that Plaintiff's alcoholism was material to his disability. Therefore, this Court recommends that Plaintiff's motion for summary judgment be denied and Defendant's motion be granted.

## IV. RECOMMENDATION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1. Plaintiff's Motion for Summary Judgment [Docket No. 6] be **DENIED**; and

2. Defendant's Motion for Summary Judgment [Docket No. 9] be **GRANTED**.

Dated:  June 24, 2010                    _s/ Susan Richard Nelson_____
                                         SUSAN RICHARD NELSON
                                         United States Magistrate Judge


Under D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **July 9, 2010**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.  Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.  A party may respond to the objecting party's brief within ten days after service thereof.  A judge shall make a de novo determination of those portions to which objection is made.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable to the Court of Appeals.